UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HOWARD TAYLOR, Derivatively on Behalf of AVIAT NETWORKS, INC., | ) ) ) | Civil Action No. \_\_11 - 635\_\_ |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| CHARLES D. KISSNER, WILLIAM A. HASLER, CLIFFORD H. HIGGERSON, EDWARD F. THOMPSON, JAMES C. STOFFEL, ERIC C. EVANS, MOHSEN SOHI, HOWARD L. LANCE, HARALD J. BRAUN, GUY M. CAMPBELL, SARAH A. DUDASH, SCOTT T. MIKUEN, CARL A. THOMSEN, and JOHN C. BRANDT, | ) ) ) ) ) ) ) ) ) ) ) | **REDACTED VERSION** |
| Defendants, | ) ) ) | |
| – and – | ) ) | |
| AVIAT NETWORKS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| _____ | ) ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST
ENRICHMENT**

COOCH AND TAYLOR, P.A.
BLAKE A. BENNETT
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: 302/984-3889
302/984-3939 (fax)
bbennett@coochtaylor.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990

July 18, 2011

**THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.  REVIEW AND
ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COUR ORDER**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.  This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant Aviat Networks, Inc. ("Aviat" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs have decimated Aviat's reputation, goodwill, and standing in the business community and caused the Company to suffer significant monetary damages.

2.  Aviat is a global supplier of turnkey wireless network solutions and comprehensive network management software. The Company designs, manufactures, and sells a range of wireless networking products, solutions, and services to, among others, mobile and fixed telephone service providers, private network operators, and government agencies. Aviat exists in its present form as a result of the acquisition of Harris Corporation's ("Harris") Microwave Communications Division ("MCD") by Stratex Networks, Inc. ("Stratex") in 2007 (the "Transaction"). The Transaction was consummated pursuant to an agreement between Harris and Stratex, the terms of which called for Stratex to acquire MCD and $25 million in cash from Harris in exchange for 56% equity ownership of the Company (then known as Harris Stratex Networks, Inc. ("Harris Stratex Networks")). The Company changed its name from Harris Stratex Networks to Aviat on January 28, 2010, as part of its global rebranding efforts.

3.  The Individual Defendants (as defined herein) have implemented and allowed the Company to engage in improper accounting practices that have vastly overstated the financial condition of the Company. Their wrongdoing dates back to the Transaction and the corresponding Registration Statement and Prospectus that became effective on January 5, 2007 (collectively, the

"Registration Statement"), issued in order to complete the Transaction.   In particular, the Registration Statement materially understated MCD's losses for fiscal year 2005 and 2006, thereby inflating its supposed value and Harris' consideration for a majority share of the Company. Nevertheless, the Individual Defendants caused the Company to acquire MCD at an overvalued price while disregarding its true value.  The Individual Defendants' misconduct did not end there. The Company's publicly-stated financial results for the next two fiscal years thereafter were improper due to the implementation of a cost accounting system that failed to timely or correctly account for the Company's earnings and assets despite the fact that the Individual Defendants knew that Aviat had serious internal control deficiencies.

4.      On July 30, 2008, Aviat announced that it would have to restate its financial statements dating back four fiscal years, from fiscal year 2005 to the first three quarters of fiscal year 2008, and admitted to "material weaknesses in its system of internal control over financial reporting." The extensive restatements were attributed to accounting errors, including untimely or inaccurate recognition of cost of sales figures and errors in balancing intercompany accounts resulting in an overstatement of accounts receivable.  The consequences of the accounting failures would prove costly, as the Company estimated that the foregoing errors and ensuing restatement would decrease the previously reported income by $18 million to $25 million.  The Individual Defendants' misconduct was especially egregious in that they were aware of the faulty accounting system that was purportedly at the root of the widespread problems that infected Aviat's accounting procedures.  Indeed, in a conference call held that same day, Aviat's Vice President and Chief Financial Officer ("CFO"), defendant Sarah A. Dudash ("Dudash"), acknowledged that the Company knew about the accounting deficiencies as early as the Transaction date, and yet failed to "migrate away from that [faulty accounting] system."

5.      The Individual Defendants' misconduct has devastated the Company and tarnished its credibility.  Aviat's market capitalization plunged by more than $375 million, or approximately 66.7% from a share price high of $22.10 on February 1, 2007 following the Transaction to the closing price of $7.35 the day after the Company announced the restatement.  The Individual Defendants have also exposed the Company to civil liability including a class action filed by investors against the Company and, among others, defendants Dudash, Guy M. Campbell ("Campbell"), Harald J. Braun ("Braun"), Howard L. Lance ("Lance"), and Scott T. Mikuen ("Mikuen") alleging violations of federal securities laws.

6.      While disseminating improper statements that had the effect of inflating the value of MCD pursuant to the Transaction, the Insider Selling Defendants (as defined herein) sold over $1.9 million worth of their personally-held stock, while in possession of material, adverse non-public information.

7.      In sum, the Individual Defendants breached their fiduciary duties by causing the Company to enter into the Transaction to acquire MCD at an overvalued price.  They knew, or were reckless in not knowing that MCD's disclosed financial results and assets grossly exaggerated the Company's valuation.  Further, the Individual Defendants issued improper statements concerning the Company's financial results.  In particular, they made improper statements in the Company's public filings and press releases that inaccurately represented the Company's earnings and assets.  These improper statements were a result of the Individual Defendants' failure to implement or maintain an adequate system of internal controls to ensure that the Company had in place proper accounting policies and procedures to fully, fairly, and accurately convey the Company's financial results and business operations to the investing public.  Plaintiff now seeks redress for harm incurred by the Company arising from this misconduct.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) the Company is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.     Plaintiff Howard Taylor is a shareholder of Aviat.  Plaintiff was a shareholder at the time of the wrongdoing of which he complains and has continuously been a shareholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

12.      Nominal defendant Aviat is a Delaware corporation and a leading global supplier of turnkey wireless network solutions and comprehensive network management software. Aviat designs, manufactures, and sells a range of wireless networking products and services to mobile and fixed telephone service providers, private network operators, government agencies, transportation and utility companies, public safety agencies, and broadcast system operators worldwide. Aviat was formed in January 2007 from the Transaction between Stratex and MCD, a former division of Harris. Formerly known as Harris Stratex Networks, the Company changed its name to Aviat in January 2010. Aviat's principal executive offices are located at 5200 Great American Parkway, Santa Clara, California.

**Individual Defendants**

13.      Defendant Charles D. Kissner ("Kissner") is Aviat's Chief Executive Officer ("CEO") and has been since June 2010 and Chairman of the Board of Directors (the "Board") and a director and has been since the Transaction in January 2007. Prior to the acquisition of MCD, Kissner was also Stratex's CEO from July 1995 to May 2000 and from October 2001 to May 2006; Chairman of the Board from August 1996 until the Transaction in January 2007; President from July 1995 to at least October 1997; and a director from July 1995 until the Transaction in January 2007. Kissner knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; (ii) caused the Company to acquire MCD which he knew, or was reckless or grossly negligent in not knowing, was overvalued; and (iii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Aviat paid Kissner the following compensation as an executive:

- 5 -

| Fiscal Year | Salary | Stock Awards | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2010 | $13,365 | $69,998 | $28,427 | $479,839 |
| 2009 | - | $59,997 | - | $506,410 |
| 2008 | - | $59,995 | - | $678,071 |

and as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $70,000 | $69,998 | $28,427 | $168,425 |
| 2009 | $82,000 | $60,983 | - | $142,983 |
| 2008 | $67,000 | $77,231 | - | $144,231 |
| 2007 | $36,000 | $37,400 | - | $73,400 |

Kissner is a citizen of California.

14.     Defendant William A. Hasler ("Hasler") was a Stratex director from August 2001 until the Transaction. After the acquisition of MCD in January 2007, Hasler remained on the Board, and is still currently an Aviat director. Hasler is also a member of Aviat's Board's Audit Committee and has been since the Transaction in January 2007. Hasler knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; (ii) caused Stratex to acquire MCD which he knew, or was reckless in not knowing, was overvalued; and (iii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Aviat paid Hasler the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $74,000 | $29,996 | $28,427 | $132,423 |
| 2009 | $95,000 | $60,983 | - | $155,983 |
| 2008 | $79,000 | $77,231 | - | $156,231 |
| 2007 | $34,000 | $37,400 | - | $71,400 |

Hasler is a citizen of California.

15.   Defendant Clifford H. Higgerson ("Higgerson") was a Stratex director from March 2006 until the Transaction in January 2007.  After the acquisition of MCD in January 2007, Higgerson remained on the Board, and is still currently an Aviat director.  Higgerson knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; (ii) caused Stratex to acquire MCD which he knew, or was reckless in not knowing, was overvalued; and (iii)  failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations.  Aviat paid Higgerson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $70,500 | $29,996 | $28,427 | $128,923 |
| 2009 | $74,500 | $60,983 | - | $135,483 |
| 2008 | $58,500 | $77,231 | - | $135,731 |
| 2007 | $31,000 | $37,400 | - | $68,400 |

Higgerson is a citizen of California.

16.   Defendant Edward F. Thompson ("Thompson") was a Stratex director from November 2002 until the Transaction. After the acquisition of MCD in January 2007, Thompson remained on the Board, and is still currently an Aviat director.  Thompson is also Chairman of Aviat's Board's Audit Committee and has been since the Transaction in January 2007.  Thompson knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; (ii) caused Stratex to acquire MCD which he knew, or was reckless in not knowing, was overvalued; and (iii)  failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations.  Aviat paid Thompson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $74,000 | $29,996 | $28,427 | $132,423 |
| 2009 | $94,000 | $60,983 | - | $154,983 |
| 2008 | $77,000 | $77,231 | - | $154,231 |
| 2007 | $39,000 | $37,400 | - | $76,400 |

Thompson is a citizen of California.

17.     Defendant James C. Stoffel ("Stoffel") is Aviat's Lead Independent Director and has been since June 2010 and a director and has been since the Transaction in January 2007. Stoffel is also a director of Harris and has been since August 2003. Stoffel knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Aviat paid Stoffel the following compensation as director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $72,000 | $29,996 | $28,427 | $130,423 |
| 2009 | $80,000 | $60,983 | - | $140,983 |
| 2008 | $68,000 | $77,231 | - | $145,231 |
| 2007 | $35,000 | $37,400 | - | $72,400 |

Stoffel is a citizen of New York.

18.     Defendant Eric C. Evans ("Evans") is an Aviat director and has been since the Transaction in January 2007. Evans is also a member of Aviat's Board's Audit Committee and has been since the Transaction in January 2007. Evans knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii)  failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately

represented the Company's financial results and business operations. Aviat paid Evans the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $64,000 | $29,996 | $28,427 | $122,423 |
| 2009 | $79,500 | $60,983 | - | $140,483 |
| 2008 | $50,000 | $96,290 | - | $146,290 |
| 2007 | $17,500 | $49,900 | - | $67,400 |

Evans is a citizen of Utah.

19.     Defendant Mohsen Sohi ("Sohi") is an Aviat director and has been since the Transaction in January 2007. Sohi knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Aviat paid Sohi the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2010 | $61,000 | $29,996 | $28,427 | $119,423 |
| 2009 | $66,000 | $60,983 | - | $126,983 |
| 2008 | $57,500 | $77,231 | - | $134,731 |
| 2007 | $25,500 | $37,400 | - | $62,900 |

Sohi is a citizen of Florida.

20.     Defendant Lance was an Aviat director from the Transaction in January 2007 to May 2009. Lance is also CEO, President, and a director of Harris and has been since January 2003 and Chairman of the Board and has been since June 2003. Lance knowingly or recklessly: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately

represented the Company's financial results and business operations. Lance is also named as a defendant in a securities class action complaint that alleges he violated section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), and sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). Lance is a citizen of Florida.

21.     Defendant Braun was Aviat's CEO, President, and a director from April 2008 to June 2010. Braun knowingly, recklessly, or with gross negligence: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Braun is also named as a defendant in a securities class action complaint that alleges he violated section 10(b) of the Exchange Act. Aviat paid Braun the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2010 | $695,000 | $933,336 | $462,999 | - | $1,895,504 |
| 2009 | $695,000 | $699,994 | $605,949 | $200,000 | $15,836 |
| 2008 | $160,385 | $100,000 | - | $131,876 | $92,128 |

Braun is a citizen of Florida.

22.     Defendant Campbell was Aviat's CEO, President, and a director from the Transaction in January 2007 to April 2008 and a senior advisor from April 2008 to June 2008. Campbell was also MCD's President from August 2003 until the Transaction in January 2007. Campbell was a member of the Integration Steering Committee, a joint executive committee of Harris and Stratex, tasked with guiding the integration of the two entities. Campbell knowingly, recklessly, or with gross negligence: (i) made and allowed improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal

- 10 -

and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Campbell is also named as a defendant in a securities class action complaint that alleges he violated section 10(b) of the Exchange Act and sections 11 and 15 of the Securities Act. Aviat paid Campbell the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2008 | $500,000 | $238,273 | $147,718 | $330,000 | $1,549,454 |
| 2007 | $426,346 | $368,941 | $283,109 | $126,000 | $108,349 |

Campbell is a citizen of North Carolina.

23. Defendant Dudash was Aviat's CFO from the Transaction in January 2007 to February 2009; Senior Vice President from at least October 2008 to February 2009; and Vice President from the Transaction in January 2007 to at least October 2008. Dudash was also MCD's Vice President and Controller from September 2006 until the Transaction in January 2007 and Division Controller from October 2003 until the Transaction in January 2007. Dudash was a member of the Integration Steering Committee, a joint executive committee of Harris and Stratex, tasked with guiding the integration of the two entities. Dudash knowingly, recklessly, or with gross negligence: (i) made improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Dudash is also named as a defendant in a securities class action complaint that alleges she violated section 10(b) of the Exchange Act and sections 11 and 15 of the Securities Act. Aviat paid Dudash the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $152,307 | - | $79,357 | - | $217,024 |
| 2008 | $240,000 | $204,329 | $119,570 | $87,120 | $21,737 |
| 2007 | $187,000 | $116,646 | $66,474 | $63,516 | $85,621 |

Dudash is a citizen of Virginia.

24.     Defendant Mikuen was Aviat's Secretary at the time the Company's registration statement was filed. Mikuen knowingly, recklessly, or with gross negligence: (i) made improper statements regarding the Company's financial results, including its earnings and assets; and (ii) failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Mikuen is also named as a defendant in a securities class action complaint that alleges he violated section 10(b) of the Exchange Act and sections 11 and 15 of the Securities Act. Mikuen is a citizen of Florida.

25.     Defendant Carl A. Thomsen ("Thomsen") was Stratex's CFO and Secretary from February 1995 until the Transaction in January 2007; Senior Vice President from April 1999 until the Transaction in January 2007; and Vice President from February 1995 to April 1999. Thomsen knowingly, recklessly, or with gross negligence caused Stratex to acquire MCD which he knew, or was reckless or grossly negligent in not knowing, was overvalued. While in possession of material, non-public information concerning MCD's true business health, Thomsen sold 70,631 shares of his stock for $1,423,283.77 in proceeds. Thomsen is a citizen of California.

26.     Defendant John C. Brandt ("Brandt") was Stratex's Vice President, Business Development from April 2006 until the Transaction in January 2007; Vice President, Global Operations from December 2004 to April 2006; Vice President, Finance from April 2003 to December 2004; Vice President, Corporate Controller from April 1999 to April 2003; and Corporate

Controller from August 1997 to April 1999. Brandt knowingly, recklessly, or with gross negligence caused Stratex to acquire MCD which he knew, or was reckless or grossly negligent in not knowing, was overvalued. While in possession of material, non-public information concerning MCD's true business health, defendant Brandt sold 24,516 shares of his stock for $514,345.68 in proceeds. Brandt is a citizen of California.

27.     The defendants identified in ¶¶13, 21-24 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-22 are referred to herein as the "Director Defendants." The defendants identified in ¶¶14, 16, 18 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶25-26 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶13-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers, directors, and/or fiduciaries of Aviat and because of their ability to control the business and corporate affairs of Aviat, the Individual Defendants owed and owe Aviat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to control and manage Aviat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Aviat and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each officer and director of the Company owes to Aviat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual

Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Codes of Ethics and Conduct**

30.     Prior to the Transaction, Stratex had in place a Code of Ethics which set forth the Company's policy to "act with honesty and integrity." According to the Code of Ethics, Stratex directors, officers, and employees were responsible for promoting "fair, accurate, timely and understandable disclosure in the periodic reports that Stratex Networks file with, or submits to, the Securities and Exchange Commission ... and in other public communications made by [Stratex]." Further, the Code of Ethics warrants that all directors, officers, and employees must comply "with applicable governmental laws, rules and regulations of the United States."

31.     Since the Transaction in 2007, the Company has in place its Code of Conduct (the "Code") that "applies to every director and employee." The Code "define[s] the standards of integrity and ethics expected" of Aviat employees. In particular, the Code requires its directors and officers to ensure that the Company's public disclosures including its U.S. Securities and Exchange Commission ("SEC") filings and earnings press releases are "full, fair, accurate, timely and understandable." Further, the Code expressly prohibits its employees from using "material, nonpublic information or other sensitive or confidential information for personal gain or advantage."

**Financial Code of Ethics**

32.     Since the Transaction, Aviat also has in place a Financial Code of Ethics (the "Financial Code") which applies to all directors, officers, and employees of the Company.[1] The

---

[1] The Financial Code is provided as Appendix A of the Code.

Financial Code is "designed to assure that [the Company] acts with honesty and integrity in all financial dealings and provides full, complete and accurate disclosure to its shareowners in its public filings and disclosures as required by law." The Financial Code sets forth the CEO and CFO's responsibility for "designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of [the Company's] disclosure controls and procedures." In addition, the Financial Code mandates that corporate officers establish and maintain "adequate internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

**Audit Committee Duties**

33.    In addition to these duties, under Aviat's Board's Audit Committee Charter in effect since the Transaction, defendants Evans, Hasler, and Thompson, as members of the Audit Committee, owe specific duties to the Company. According to the Audit Committee Charter, these defendants are responsible for overseeing the Company's "accounting and financial reporting processes." In particular, Audit Committee Defendants must assist the Board in monitoring: (i) "the integrity of the [Company's] financial statements"; (ii) "the [Company's] accounting policies and procedures"; (iii) "the [Company's] compliance with legal and regulatory requirements"; (iv) "the performance of the [Company's] internal audit function"; (v) "the [Company's] disclosure controls and procedures"; and (vi) "the [Company's] internal controls." The Audit Committee met five times in 2007 and thirteen times in 2008.

**Control, Access, and Authority**

34.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Aviat, were able to and did, directly and/or indirectly, exercise control

- 15 -

over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

35.     Because of their advisory, executive, managerial, and directorial positions with Aviat, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Aviat.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Aviat, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

37.     To discharge their duties, the officers and directors of Aviat were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Aviat were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Aviat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

38.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Aviat, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Aviat's Board.

39.     The Individual Defendants breached their duty of loyalty and good faith by allowing other Individual Defendants to cause, or by themselves causing, the Company to issue improper statements regarding its financial results, and failing to implement or maintain adequate financial controls to prevent the dissemination of the foregoing improper statements. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws. As a result, Aviat has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Aviat, regarding the Company's financial results and internal controls; (ii) cause the Company to acquire MCD for an overvalued consideration; (iii) allowed the Company to operate without an adequate system of internal controls; and (iv) enhance the Individual Defendants' executive and directorial positions at Aviat and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and allow the Company to operate with adequate internal or financial controls. Because the actions described herein occurred under the authority of the Board, each of the Individual

Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE TRANSACTION AND CORRESPONDING IMPROPER STATEMENTS

45.     On September 5, 2006, Harris and Stratex announced that they had entered into a definitive agreement to combine Harris's MCD division with Stratex, and have the combined company to be named Harris Stratex Networks.  Pursuant to the agreement, Stratex would acquire MCD and $25 million in cash from Harris for 56% ownership of Harris Stratex Networks.  The Transaction was unanimously approved and recommended by Stratex's Board, including defendants Kissner, Hasler, Higgerson, and Thompson.

46.     The Registration Statement recommending shareholder approval for the Transaction was deemed effective by the SEC on January 5, 2007, and contained MCD's financial results that understated the true extent of its losses for fiscal years 2005 and 2006.  In the Registration Statement, defendants Campbell, Dudash, Lance, and Mikuen incorporated MCD's combined statements of operations reporting: (i) loss before income taxes of $29.1 million and $3.5 million in fiscal year 2006 and 2005, respectively; and (ii) net loss of $35.8 million and $3.8 million in fiscal year 2006 and 2005, respectively.  Further, the Registration Statement incorporated MCD's combined balance sheet for fiscal year 2006, reporting accounts receivable of $123.9 million and inventories of $71.9 million. These statements were improper because they understated MCD's

earnings and overstated its assets. In particular, the Registration Statement understated MCD's losses before income by $2.8 million or 8.8% in fiscal 2006, by $3 million or 46.2% in fiscal 2005; and understated net loss by $2.8 million or 7.3% in fiscal 2006, $3 million or 44.1% in fiscal 2005. Further, its inventories were overstated by $5.5 million or 8.3% in fiscal 2006.

47.    The recommendation and consummation of the Transaction constituted a breach of defendants Kissner, Hasler, Higgerson, and Thompson's fiduciary duties because they knew and disregarded, or were recklessly unaware, that MCD was grossly overvalued. In fact, according to the Registration Statement, Kissner, Hasler, Higgerson, and Thompson explicitly cited "information concerning the financial performance, condition and business operations of [MCD]" as one of the reasons they recommended Stratex shareholders vote for the Transaction. The Registration Statement also stated that Kissner, Hasler, Higgerson, and Thompson considered "the favorable relative contribution that Stratex and [MCD] would each be making to the combined company" in reaching its conclusion that the Transaction was "fair to, and in the best interests of, Stratex and [its stockholders]." Each of these statements was incorrect. Similarly, defendants Thomsen and Brandt played a material role as executives of Stratex in causing the Transaction to close despite their knowledge, or reckless and grossly negligent disregard of the fact that MCD's reported financial results and assets were overstated.

48.    On January 26, 2007, Harris and Stratex finalized the Transaction with Stratex acquiring MCD and renaming its Harris Stratex Networks, thus cementing the inadequate consideration the Company received for the 56% share of its equity.

### POST-TRANSACTION IMPROPER STATEMENTS

49.    The improper statements continued on after the close of the Transaction as the Individual Defendants failed to take appropriate measures to remedy the accounting issues ailing the Company. On January 30, 2007, Aviat issued a press release announcing the Company's pre-

Transaction financial result for the fiscal 2007 second quarter ended December 29, 2006. The Company reported a net income of $5.8 million.

50.     On February 16, 2007, the Company filed its second quarter 2007 Form 10-Q. In the 10-Q, defendant Dudash reiterated the Company's earnings figure reported in the press release. Defendants Campbell and Dudash reviewed and certified to the truth of the above statements.

51.     On May 1, 2007, Aviat issued a press release announcing the Company's financial result for the fiscal 2007 third quarter ended March 30, 2007. The Company reported a net loss of $23.2 million.

52.     On May 8, 2007, the Company filed its third quarter 2007 Form 10-Q. In the 10-Q, defendant Dudash reiterated the Company's losses reported in the press release. Defendants Campbell and Dudash reviewed and certified to the truth of the above statements.

53.     On August 7, 2007, Aviat issued a press release announcing its financial results for both the fourth quarter and the 2007 fiscal year ended June 29, 2007. For its statement of operations for the fiscal year, the Company reported a cost of external product sales of $281.2 million, loss before income taxes of $21.9 million, and net loss of $17.9 million. On its balance sheet for the fiscal year, the Company recognized accounts receivable of $185.3 million, and a combined inventories and unbilled costs of $169.8 million.

54.     On August 27, 2007, the Company filed its 2007 Form 10-K. In the 10-K, defendants Campbell, Dudash, Kissner, Evans, Hasler, Higgerson, Lance, Sohi, Stoffel, and Thompson reiterated the Company's figures reported in its statement of operations and its accounts receivable figure from its balance sheet. These defendants also reported inventories excluding unbilled costs of $135.7 million. Defendants Campbell and Dudash reviewed and certified to the truth of the above statements.

55.     On November 1, 2007, Aviat issued a press release announcing the Company's financial result for the fiscal 2008 first quarter ended September 28, 2007. The Company reported a net loss of $800,000, and recognized inventories including unbilled costs of $183.7 million.

56.     On November 6, 2007, the Company filed its first quarter 2008 Form 10-Q. In the 10-Q, defendants Dudash reiterated the Company's earnings figure reported in the press release, and recognized inventories excluding unbilled costs of $135.1 million. Defendants Campbell and Dudash reviewed and certified to the truth of the above statements.

57.     On January 30, 2008, Aviat issued a press release announcing the Company's financial result for the fiscal 2008 second quarter ended December 28, 2007. The Company reported a net loss of $1 million, recognized accounts receivable of $207.6 million, and inventories including unbilled costs of $168.4 million.

58.     On February 5, 2008, the Company filed its second quarter 2008 Form 10-Q. In the 10-Q, defendant Dudash reiterated the Company's earnings figure reported in the press release, and recognized inventories excluding unbilled costs of $130 million. Defendants Campbell and Dudash reviewed and certified to the truth of the above statements.

59.     On April 29, 2008, Aviat issued a press release announcing the Company's financial result for the fiscal 2008 third quarter ended March 28, 2008. The Company reported a net income of $7.3 million, recognized accounts receivable of $199 million, and inventories including unbilled costs of $161 million.

60.     On May 6, 2008, the Company filed its third quarter 2008 Form 10-Q. In the 10-Q, defendant Dudash reiterated the Company's earnings figure reported in the press release, and recognized inventories excluding unbilled costs of $125.3 million. Defendants Braun and Dudash reviewed and certified to the truth of the above statements.

61.     The above statements made or authorized by the Individual Defendants were improper because they misrepresented the Company's earnings and losses and overstated the Company's balance sheet figures including accounts receivable and inventories. For fiscal 2007, the Individual Defendants overstated the Company's reported inventories by $11.5 million or 9.3%, and understated the Company's net loss by $3.9 million or 17.9%. Finally, for the three quarters of fiscal 2008, the Individual Defendants overstated Aviat's net income by $3.7 million or 205%, and overstated its inventories by $16.6 million or 15.3%.

## AVIAT ANNOUNCES THE RESTATEMENT

62.     The pervasive and systematic deficiencies in the Company's accounting and disclosure procedures and practices was suddenly revealed to the public on July 30, 2008, when the Company delivered shocking news that it would restate its filings dating back four fiscal years to 2005. Specifically, Aviat disclosed that its financial statements for the first three quarters of fiscal year 2008 and fiscal years 2007, 2006, and 2005 should no longer be relied on. The Company attributed the restatement to a multitude of "errors" including project cost variances that were neither timely nor correctly recorded to cost of sales, and errors in balancing intercompany accounts resulting in overstated accounts receivable. The consequences of the foregoing errors were serious, as the Company acknowledged that it expected "the cumulative effect of these errors ... to decrease previously reported pre-tax income by ... $18 million to $25 million." Although the above accounting errors indicated as much, Aviat admitted that it "believes there [were] one or more material weaknesses in its system of internal control over financial reporting that led to the need to restate its financial statements."

63.     That same day in an earnings conference call, the Company elaborated on the accounting issues necessitating the restatement. Defendant Dudash disclosed that the Company discovered "some accounting errors" during review of its "year-end close" and fourth quarter results

- 23 -

that were attributed to "*a single system that handles [Aviat's] US manufacturing cost accounting.*"

Defendant Braun also vaguely insisted that the accounting irregularities leading to the restatements

were a "*system issue*" and that the Company would need to revamp its accounting practices by

"migrating off of [its] current cost accounting system and have accelerated the development of

replacement tools." Defendant Dudash agreed, acknowledging that the accounting errors were the

result of a "*combination of process breakdowns and tool breakdowns.*"   However, most

importantly, defendant Dudash admitted that the Individual Defendants were aware of the

deficiencies in the accounting system since the close of the Transaction during the

"*integration process*," and the need to "*migrate away*" from the faulty accounting procedures:

> **Analyst**
>
> And that [faulty accounting] system has been integrated into the systems that are working or is going to be or what?
>
> **Sally Dudash** - *Harris Stratex Networks - VP, CFO*
>
> It is a standalone system, and it had been scheduled--as Harold [sic] mentioned, we had--*it was on our roadmap to migrate away from that system during our integration process*, and that migration did not occur and now it has become one of our priority items.

64.     Defendants Dudash and Braun also maintained that the Company's issues were

isolated to a single system in a single domestic location. Yet, these defendants failed to identify the

troublesome information system or the particular location that was affected:

> **Analyst**
>
> Okay. And one last one from me and then I'll jump back in the queue, but can you disclose to us--you mentioned in the press release, it seemed like one particular location was the guilty party in terms of this accounting issue. Can you disclose whether that was a Harris or a Stratex location, and any additional color you can provide there?
>
> **Harold Braun** - *Harris Stratex Networks - President, CEO*
>
> Yes. Steve, I would like really to distinguish between the tool and the location. This is a system issue. That was a system issue and in principal had nothing to do with the location. *So that tool was actually active in that particular location, and only in*

*that location*. So it really has nothing to do in the end with the location. It was the system which was installed there, so therefore I really would not like to put that location on the spot here. It really had nothing to do with it.

* * *

**Analyst**

Okay. And the cost accounting system at one location is--?

**Sally Dudash** - *Harris Stratex Networks - VP, CFO*

Yes.

**Analyst**

Where is that location?

**Sally Dudash** - *Harris Stratex Networks - VP, CFO*

So what we wanted, we really wanted to focus more on it's a *single system* that handles our US manufacturing cost accounting, so the location is really not as important as the fact that it is one system.

65.  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

66.     Despite acknowledging the necessity of a restatement, the Individual Defendants still continued to obfuscate the underlying cause of the material weaknesses and the scope of its penetration throughout the Company.  For instance, defendants Dudash and Braun attributed the accounting issue to unspecified "system" errors encountered as a result of integrating certain "new processes."  However, Dudash and Braun's explanation conflicted with the reason given by Harris's CFO, Gary McArthur ("McArthur"), in an August 5, 2008 Harris conference call.  McArthur dismissed the notion that the unexplained faulty accounting "system" caused the accounting issues, but rather blamed the personnel directly responsible for implementing the accounting procedures:

- 25 -

**Analyst**

Secondly, on the same topic, I guess it wasn't quite clear on their call. But it seemed as though, the legacy system that was responsible for the accounting error was a Harris system. Correct me if that is not correct. And if it is correct, I am wondering if that same system is used elsewhere in Harris and if you have gone back and made sure that it is not affecting any of the other businesses.

**Gary McArthur** - *Harris - CFO*

Thanks for e [sic] question, because I do want to clarify what was said on the Harris Stratex call. The answer to your second question is no, this IT system is not used anywhere else in the company. It has been upgraded and replaced everywhere else that it was used previously. This was not an IT system error or problem. This was a process problem with people in finance and accounting not doing reconciliations that had previously been done. So the IT system they're using was functioning. It's not world class, but it functions the way it's been functioning probably for the 20 years it's been used before and after the Transaction. So nothing changed there. ***What changed was people not following the process. And it is somewhat a manual process to reconcile lots of accounts and lots of work in process project orders. So that's what wasn't done. Nothing with the system changed.***

67. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



68.

69.     On September 19, 2008, Aviat finally filed a Form 8-K with the SEC disclosing the results of the restatement.  According to the 8-K, the restatements decreased shareholder equity by $15.3 million as of March 28, 2008, $11.6 million as of June 29, 2007,  $7.7 million as of June 30, 2006, and $4.9 million as of July 1, 2005.  Further, earnings decreased by $3.7 million for the first three quarters of fiscal year 2008, and net loss increased by $3.9 million, $2.8 million, and $3.0 million for the fiscal years 2007, 2006, and 2005, respectively.  The 8-K provided further detail as to the accounting errors including, among other things: (i) WIP inventory that were either untimely or incorrectly recorded to cost of sales; (ii) discrepancies in account reconciliation adjustments relating to inventory and intercompany accounts receivable accounts; and (iii) "errors in accounts receivable balances as a result of control deficiencies in the recording and elimination of intercompany transactions."

**THE MATERIAL WEAKNESSES AND CONTROL DEFICIENCIES WERE PREVALENT AND WELL-KNOWN BY THE INDIVIDUAL DEFENDANTS**

70.



71.



**INSIDER SELLING**

72.     The Individual Defendants knowledge of the true valuation of MCD is also shown in Stratex's officers' sales of personally-held stock.  These Insider Selling Defendants were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stockholdings immediately upon consummation of the Transaction and before the truth came to light.  These Insider Selling Defendants capitalized on the fact that the public was unaware of the extent of MCD's losses as disclosed in the Registration Statement and misappropriated such information for their own personal gain.

73.     Combined, defendants Brandt and Thomsen sold over to $1.9 million worth of their Company stock within less than two months following the Transaction.  The following is a table showing their total sales:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BRANDT | 2/26/2007 | 4,954 | $20.98 | $103,934.92 |
| | 2/26/2007 | 1,302 | $20.98 | $27,315.96 |
| | 2/26/2007 | 16,250 | $20.98 | $340,925.00 |
| | 2/26/2007 | 2,010 | $20.98 | $42,169.80 |
| | | 24,516 | | $514,345.68 |
| THOMSEN | 2/7/2007 | 1,047 | $21.00 | $21,989.93 |
| | 2/8/2007 | 8,334 | $20.51 | $170,910.34 |
| | 2/8/2007 | 8,000 | $20.51 | $164,060.80 |
| | 2/21/2007 | 17,000 | $20.76 | $352,964.20 |
| | 2/21/2007 | 10,000 | $20.76 | $207,626.00 |
| | 3/14/2007 | 20,000 | $19.27 | $385,320.00 |

|  | 3/14/2007 | 5,000 | $19.27 | $96,330.00 |
|---|---|---|---|---|
|  | 3/14/2007 | 1,250 | $19.27 | $24,082.50 |
|  |  | 70,631 |  | $1,423,283.77 |
|  |  |  |  |  |
| **Total:** |  | **95,147** |  | **$1,937,629.45** |

74.     Defendants Brandt and Thomsen's sale of their personally-owned stock was well-timed and executed to take full advantage of the misinformation disseminated to the public concerning the Transaction. In fact, merely a month after the close of the Transaction, defendant Brandt sold over $514,000 worth of the Company's stock in a single day which represented 99.9% of his Company holdings. Similarly, defendant Thomsen sold over $1.4 million less than two months after the finalization of the Transaction which represented 82.6% of his Company holdings. Notably, the Insider Selling Defendants sold essentially all of their Company holdings immediately after the Transaction, seizing on their insider knowledge that MCD was overvalued, and the Company's stock was artificially inflated.

## THE SECURITIES CLASS ACTION

75.     Beginning with the complaint filed October 6, 2008, investors brought a class action against the Company and defendants Campbell, Braun, Dudash, Lance, and Mikuen, among others, alleging violations of federal securities laws. Thereafter, the cases were consolidated on June 5, 2009, and a consolidated complaint was filed on July 29, 2009. The consolidated class complaint alleged the above-defendants made false and misleading statements concerning Aviat's financial results and business operations for fiscal years 2007 and 2008, and about MCD's business results in the Company's Registration Statement and Prospectus related to the Transaction.

76.     On October 9, 2009, the defendants in the class action filed a motion to dismiss the consolidated class complaint asserting plaintiff had failed to state a claim for relief. The motion to dismiss was substantially denied on July 22, 2010. In substantially denying defendants' motion to dismiss, the Honorable Joseph J. Farnan, Jr. of the United States District Court for the District of

Delaware reasoned that the plaintiffs successfully plead "[d]efendants knew that their accounting system was faulty for a lengthy period of time, that the misstatements were the result of improprieties concerning basic accounting principles, that the errors were significant, and the [d]efendants have been evasive regarding the reasons for the irregularities." As such, Judge Farnan concluded that a dismissal for failure to state a claim was unwarranted as to the majority of the false and misleading statements alleged in the complaint.

### DAMAGES TO AVIAT

77.     As a result of the Individual Defendants' improprieties, the Company has incurred and will incur significant costs and expenditures. The Individual Defendants' fraudulent conduct and improper statements have devastated Aviat's credibility as reflected by the Company's over $375 million market capitalization decline once the truth was revealed.

78.     Further, as a direct and proximate result of the Individual Defendants' actions, Aviat has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in its re-audit and restatement of its financial statements the first three quarters of fiscal year 2008 and fiscal years 2007, 2006, and 2005;

(b)     costs incurred in defending and settling the securities class action that were not covered by insurance; and

(c)     costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Aviat.

79.     Moreover, these actions have irreparably damaged Aviat's corporate image and goodwill. For at least the foreseeable future, Aviat will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior

and have misled the investing public, such that Aviat's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff brings this action derivatively in the right and for the benefit of Aviat to redress injuries suffered, and to be suffered, by Aviat as a direct result of breach of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Aviat is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.     Plaintiff will adequately and fairly represent the interests of Aviat in enforcing and prosecuting its rights.

82.     Plaintiff is a shareholder of Aviat. Plaintiff was a shareholder at the time of the wrong doing of which he complains and has continuously been a shareholder.

83.     The current Board of Aviat consists of the following eight individuals: Raghavendra Rau and defendants Kissner, Evans, Hasler, Higgerson, Sohi, Stoffel, and Thompson. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act as set forth below.

### Demand Is Excused Because Defendants Kissner, Hasler, Higgerson, and Thompson's Decision to Enter into the Transaction Was Not a Valid Business Judgment

84.     Defendants Kissner, Hasler, Higgerson, and Thompson, as members of the Board at the time of the Transaction, collectively forced through the acquisition of MCD at an overvalued consideration. Their decision to approve and recommend the acquisition of MCD was not a fully-informed decision made in good faith because they knew, or failed to ascertain MCD's true valuation in breach of their fiduciary duties. As alleged herein, MCD's reported financial results and assets were materially inaccurate and understated MCD's losses by approximately 44.1% in fiscal 2005.

MCD's historical financial results and the integrity of its assets was fundamentally crucial in evaluating the entity's worth, and consequently whether the Board and its shareholders should approve the Transaction.  Nevertheless, Kissner, Hasler, Higgerson, and Thompson either knew or failed to take appropriate measures to discover MCD's true valuation which was vital to ensuring the Transaction was in the Company's best interest.  As such, Kissner, Hasler, Higgerson, and Thompson's failure to exercise good faith and fully-informed judgment as to the Transaction is indefensible and cannot avail itself of the business judgment rule.  Accordingly, demand upon Kissner, Hasler, Higgerson, and Thompson is futile.

**Demand Is Excused Because Defendants Kissner, Evans, Hasler, Higgerson, Sohi, Stoffel, and Thompson Face a Substantial Likelihood of Liability for Their Misconduct**

85.    Defendants Kissner, Hasler, Higgerson, and Thompson breached their fiduciary duty of loyalty by knowingly or recklessly authorizing the Transaction between Stratex and MCD in their role as directors of Stratex, and making and allowing  the improper statements concerning Aviat's financial conditions and internal controls.  Kissner, Hasler, Higgerson, and Thompson owed a fiduciary duty to Stratex to ensure that any acquisition was in its best interest and that shareholders received fair, accurate, and complete disclosures as to the Transaction.  This they did not do, as they unanimously recommended Stratex to enter into the Transaction with MCD knowing, or recklessly disregarding, the fact that MCD's publicly disclosed financial results and assets were materially overstated and did not fairly reflect its true financial health.  Upon consummation of the Transaction, Kissner, Hasler, Higgerson, and Thompson remained on as directors of the newly-formed Company and proceeded to provide the same utter lack of regard for their fiduciary duties owed to Aviat.  Specifically, these defendants allowed the Company to implement and maintain faulty and deficient accounting procedures and practices that effectively inflated the Company's earnings and assets.  As a result of employing the foregoing faulty cost accounting systems, Kissner, Hasler, Higgerson, and

Thompson made and allowed the Company to make improper statements in their public filings and press releases concerning the Company's financial results. Indeed, as the Company's internal audit reports and SOX 404 testing updates demonstrate, Aviat's internal controls and accounting systems were riddled with significant "control weaknesses." These defendants' actions were especially egregious because, as defendant Dudash acknowledged, they knew or recklessly was unaware that the Company would have to "migrate away from [the faulty accounting] system" since the Transaction was consummated. In fact, Kissner, Hasler, Higgerson, and Thompson expressly disclosed in Stratex's Form 10-K for fiscal year 2006 that there were material weaknesses impairing the Company's "internal control over financial reporting."

Therein, Kissner, Hasler, Higgerson, and Thompson oversaw the Company's continuous and systematic improper disclosures which have tarnished Aviat's credibility, caused the Company's market capitalization to plummet, and forced the Company to negotiate a $8.9 million settlement to resolve a securities action against it. Accordingly, Kissner, Hasler, Higgerson, and Thompson breached their fiduciary duties to the Company and face a substantial likelihood of liability. Demand upon them is futile.

86. Defendants Sohi, Evans, and Stoffel breached their fiduciary duties of loyalty by knowingly or recklessly making and allowing the improper statements in Aviat's press releases and SEC filings regarding the Company's financial results and business operations. In particular, these defendants made improper statements that overstated Aviat's earnings, understated its losses, and inflated the Company's assets. These improper statements were caused by Sohi, Evans, and Stoffel's

- 34 -

failure to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. Worse, as defendant Dudash disclosed, these defendants knew of the accounting issues infecting the Company's disclosures, and still failed to take proper corrective action to remedy the admitted "material weaknesses" that ailed the Company. These defendants' failure to ensure proper accounting and disclosure controls were in place have compromised Aviat's credibility, resulted in a staggering market capitalization drop of approximately $376 million, and have exposed the Company to legal liability in the form of a securities class action that is expected to settle for approximately $8.9 million. Accordingly, Sohi, Evans, and Stoffel cannot impartially consider a demand to initiate litigation because they face a substantial likelihood of liability. Demand upon Sohi, Evans, and Stoffel is futile.

87.     Defendants Evans, Hasler, and Thompson, as members of the Audit Committee, had additional and heightened responsibilities to oversee the "accounting and financial reporting processes," and monitor, among other things, "the integrity of [Aviat's] financial statements" and "the [Company's] accounting policies and procedures." Audit Committee Defendants also had a duty to oversee "the performance of the company's internal audit function." In sum, these Audit Committee Defendants were responsible for reviewing Aviat's internal controls. They failed miserably. As evidenced by the extensive restatement that covers every period starting with the inception of Aviat (then Harris Stratex Networks) up to the first three quarter of fiscal 2008, Evans, Hasler, and Thompson's failure to render proper oversight of the Company's accounting and disclosure controls doomed the Company from the beginning. Indeed, the internal controls (or lack thereof) present at the Company were so incompetent that the Company expressly admitted in its press release announcing the restatement that "the Company believes there are one or more material

weaknesses in its system of internal control over financial reporting that led to the need to restate its

financial statements." 

Accordingly, as alleged

herein, Evans, Hasler, and Thompson breached their specific duties owed as members of the Audit

Committee to oversee the Company's accounting and disclosure processes and face a substantial

likelihood of liability for their breach of fiduciary duties.   Any demand upon them is futile.

88.     Defendants Kissner, Evans, Hasler, Higgerson, Sohi, Stoffel, and Thompson, as

members of the Board, were and are subject to the Code and the Financial Code. The Code went

well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code

required, among other things, that Kissner, Evans, Hasler, Higgerson, Sohi, Stoffel, and Thompson,

to uphold Aviat's "standards of integrity and ethics."   In particular, under the Code, Kissner, Evans,

Hasler, Higgerson, Sohi, Stoffel, and Thompson were required to ensure that the Company's public

disclosures including its SEC filings and earnings press releases are "full, fair, accurate, timely and

understandable." In addition, the Financial Code specifically required these defendants to ensure the

"effectiveness of [Aviat's] disclosure controls and procedures," and establish "adequate internal

controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements." Kissner Hasler, Higgerson, and Thompson also were bound by the Code of Ethics as directors of Stratex. The Code of Ethics was substantially similar to Aviat's Code and required its directors and officers to promote "fair, accurate, timely and understandable disclosure[s]." This they did not do. As stated herein, these defendants violated all three codes by making and allowing the Company to make improper financial disclosures in its public filings and press releases. Further, these defendants failed to ensure that the Company was operating proper accounting practices and procedures, by failing to implement or maintain proper internal or financial controls. Because Kissner, Evans, Hasler, Higgerson, Sohi, Stoffel, and Thompson violated the codes, they face a substantial likelihood of liability for breaching their fiduciary duties, thereby demand upon them is futile.

89.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Aviat's officers and directors and these acts are incapable of ratification.

90.     Aviat has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Aviat any part of the damages Aviat suffered and will suffer thereby.

91.     If Aviat's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Aviat. However, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Aviat against these

defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Aviat to sue themselves or certain of the officers of Aviat, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause Aviat to sue the Individual Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

92.    Plaintiff has not made any demand on the other shareholders of the Company to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    the Company is a publicly held company with over 60.6 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

93.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.    Individual Defendants owed and owe Aviat fiduciary obligations. By reason of their fiduciary relationships, Individual Defendants owed and owe Aviat the highest obligation of good faith, fair dealing, loyalty, and due care.

95.    The Director Defendants Kissner, Hasler, Higgerson, and Thompson of the Company owed Aviat the highest duty of loyalty and due care. These defendants breached their duty of loyalty by knowingly or recklessly making, and allowing the Company to make, improper statements concerning Aviat's financial results including its earnings and assets. In particular, the Director Defendants allowed the Company to operate with a faulty cost accounting system, and failed to implement an effective system of internal and financial controls to ensure the Company's accounting policies and procedures and its public disclosures fully, fairly, and accurately represented the Company's financial results and business operations. The Director Defendants further breached their duties as directors of Stratex by approving and recommending the Company to enter into the Transaction combination knowing or recklessly disregarding the fact that Harris's contribution to the Transaction - MCD - was materially overvalued due to its overstated financial results reported in the Registration Statement. Accordingly, the Director Defendants breached their fiduciary duties in making or allowing the improper statements alleged herein; authorizing the Transaction combination with MCD that they knew, or was reckless or grossly negligent in not knowing, was overvalued; and failing to implement proper internal or financial controls.

96.    The Officer Defendants of the Company owed Aviat the highest duty of loyalty and due care. The Officer Defendants breached their duty of loyalty and due care by knowingly, recklessly, or with gross negligence making, or allowing the Company to make, improper statements concerning its financial results including its earnings and assets. Further defendants Campbell, Dudash, and Mikuen made improper statements in the Registration Statement that grossly exaggerated MCD's financial results, thereby inflating its value prior to and leading up to the Transaction. Once the Transaction was consummated, the Officer Defendants failed to take proper measures to implement adequate internal controls to ensure that the Company had an effective

- 39 -

accounting system to fully, fairly, and accurately report Aviat's financial health. The Officer Defendants' failures were all the more flagrant because these defendants knew of Aviat's significant control deficiencies as early as the Transaction, and knew that the Company would have to "migrate" away from this faulty accounting system. Nevertheless, the Officer Defendants allowed the Company to keep operating with the faulty accounting system, and in turn, make improper disclosures concerning the Company's financial results. Accordingly, the Officer Defendants breached their fiduciary duties in making or allowing the improper statements alleged herein, and failing to implement proper internal or financial controls.

97.      Defendants Thomsen and Brandt as officers of Stratex at the time of the Transaction breached their fiduciary duty of loyalty and care owed to the Company. These defendants knowingly, recklessly, or with gross negligence caused the Company acquire MCD which they knew, or were reckless or grossly negligent in not knowing, was overvalued given MCD's understated losses and overstated assets. Further, Thomsen and Brandt breached their duty of loyalty by selling over $1.9 million of their personally-held Aviat stock on the basis of their knowledge of the improper information described above before that information was revealed to the Company's shareholders. The information described above was proprietary, non-public information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which these Insider Selling Defendants used for their own benefit when they sold Aviat stock.

98.      Defendants Evans, Hasler, and Thompson breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee. These defendants were responsible for reviewing and overseeing the Company's accounting procedures and practices, and ensuring the integrity of its financial statements. In a

complete and utter abdication of their heightened duties under the Audit Committee Charter, Evans, Hasler, and Thompson knowingly or recklessly allowed the Company to issue improper statements regarding the Company's financial results and business operations. Further, Evans, Hasler, and Thompson breached their fiduciary duties under the Audit Committee Charter by knowingly or recklessly failing to implement or maintain an adequate system of internal or financial controls to ensure the Company's accounting procedures, and that its public disclosures fully, fairly, and accurately reflected the Company's true financial health.

99.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Aviat has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

100.    Plaintiff, on behalf of Aviat, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Waste of Corporate Assets**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    As a result of the extensive deficiencies in the Company's accounting procedures, the various improper statements that misrepresented the Company's earnings, losses, and assets, and by failing to conduct proper supervision and implement or maintain proper internal controls, the Individual Defendants have caused Aviat to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

103.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

104.    Plaintiff, on behalf of Aviat, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Aviat. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Aviat.

107.    The Insider Selling Defendants sold Aviat stock while in possession of material, adverse non-public information that artificially inflated the price of Aviat stock. As a result, these Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

108.    Plaintiff, as a shareholder and representative of Aviat, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

109.    Plaintiff, on behalf of Aviat, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Aviat, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Aviat to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Aviat and its

shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

        (i)      a proposal to strengthen the Company's controls over financial reporting;

        (ii)     a proposal to strengthen Aviat's oversight of its auditing, accounting, and disclosure procedures;

        (iii)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        (iv)    a provision to control insider selling; and

        (v)     a provision to permit the shareholders of Aviat to nominate at least three candidates for election to the Board;

C. Extraordinary equitable and/or injunctive relief as permitted by law and equity, sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Aviat has an effective remedy;

D. Awarding to Aviat restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 18, 2011                    COOCH AND TAYLOR, P.A.


Blake A. Bennett (Del. Bar No. 5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: 302/984-3889
302/984-3939 (fax)
bbennett@coochtaylor.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

622056